IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| BRANDON L. TATUM, | CIVIL ACTION NO. 9:17-cv-140 |
| *Plaintiff,* | JURY TRIAL DEMANDED |
| v. | |
| SOUTHERN POWER COMPANY | |
| *Defendant.* | |

## COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, Brandon L. Tatum, and files this, his Complaint and Jury Demand, against Defendant, Southern Power Company, alleging unlawful interference and retaliation under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654 (2006) (hereinafter "FMLA") and respectfully states the following:

### JURISDICTION AND VENUE

1.      This action involves application of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*. This court has jurisdiction of this action pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1331.

2.      The claims asserted in this action arose within this district and the alleged discrimination and damage occurred in this district. Venue of this action is proper pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1391.

### PARTIES AND SERVICE

3.      Plaintiff Brandon L. Tatum, (hereinafter "Mr. Tatum" or "Plaintiff") is a United States and Texas citizen and is a Rusk County resident.

4.      Defendant Southern Power Company (hereinafter "Southern Power" or "Defendant") is a Delaware corporation, with its principal place of business in Atlanta, Georgia. Southern Power's biomass plant, Nacogdoches Generating Facility (hereinafter "Plant Nacogdoches"), is located in Cushing, Nacogdoches County, Texas. Defendant may be served with process by service on its registered agent, Corporation Ser Co, at 40 Technology Parkway S #300, Gwinnett, Norcross, GA, 30092.

## RESPONDEAT SUPERIOR AND RATIFICATION

5.      Whenever is alleged in this Complaint that Southern Power's officers, agents, servants, employees, or representatives committed an act and/or omission, it is alleged to be done with the full authorization or ratification of the Southern Power or in the normal and routine course and scope of employment.

## CONDITIONS PRECEDENT

6.      All conditions precedent to jurisdiction have occurred or been complied with since on January 20, 2017, the day he provided notice of FMLA leave,:

  a.  Mr. Tatum had been employed for at least twelve months by Southern Power, had worked at least 1,250 hours for Southern Power in the last twelve-month period,

  b.  Southern Power was engaged in commerce and employed fifty or more employees for each working day during each of twenty or more calendar workweeks in the current or preceding calendar year,

  c.  Mr. Tatum's health condition (1) could require periodic treatment, (2)

continues over an extended time, and (3) may cause episodic incapacity.

    d.  Mr. Tatum suffered from a serious health condition that made him unable to perform the functions of his position,

    e.  Mr. Tatum gave Southern Power the appropriate notice for his unforeseen need to take FMLA leave, and

    f.  Mr. Tatum had taken less than twelve workweeks of leave during the preceding twelve-month period.

## FACTUAL ALLEGATIONS

7.    Mr. Tatum was born in 1980; he is currently thirty-seven years old and has a normal life expectancy.

8.    Southern Power is a private sector employer, is a leading U.S. wholesale energy provider, and operates over forty facilities in ten states including Texas.

9.    Southern Power began commercially operating Plant Nacogdoches in 2012. Plant Nacogdoches serves the Austin, Texas energy market and is one of the largest a biomass-fueled electric generating plants in the United States.

10.    On November 14, 2011 Southern Power hired Mr. Tatum to work as an Operations Technician 1 at Plant Nacogdoches.

11.    Southern Power employed Mr. Tatum for over five years, from November 14, 2011 to February 2, 2017.

12.    During his time at Southern Power, Mr. Tatum worked at least forty hours per week and physically reported to and performed work at Plant Nacogdoches as required by his position.

13.    Mr. Tatum's supervisors were Operations & Maintenance manager Terry Jenkins,

Plant Manager Ron Ray, Maintenance Team Leader Chris Honeycutt, and Team Leader Nicole Jackson.

14.     One of Southern Power's company values is "Safety First," which it has described on its website as: "We believe the safety of our employees and customers is paramount. We will perform and maintain every job, every day, safely."

15.     Southern Power's Code of Ethics begins with a section titled "Safety and Health" where it states: "We work safely, and we watch out for each other. Our goal is for everyone to go home healthy, every day. We do not compromise on safety. We complete required training, and we report and correct unsafe situations."

16.     Upon information and belief, Southern Power has a progressive disciplinary policy for handling employee discipline.

17.     In October 2016, Mr. Tatum raised safety concerns regarding work done at Plant Nacogdoches's New Compressed Air Building that he believed did not follow the American Society for Testing and Materials standards for pipe welds. Mr. Tatum raised his concerns internally to Mr. Jenkins, and to Southern Power's human resources and ethics & compliance point people, and externally to the Occupational Safety and Health Administration (hereinafter "OSHA").

18.     How Southern Power has handled the safety concerns that Mr. Tatum raised in October 2016 is the subject of an ongoing OSHA investigation.

19.     Prior to raising safety concerns in October 2016, Mr. Tatum has had good performance reviews by Southern Power.

20.     Prior to raising safety concerns in October 2016, Mr. Tatum has had no disciplinary actions taken against him by Southern Power.

4

21.     Sometime during the first two weeks of January 2017 and in response to Mr. Tatum continuing to voice the safety issues he originally raised in October 2016 that he felt, were not addressed, Mr. Jenkins explicitly told Mr. Jenkins "why don't you just worry about your job and not that pipe."

22.     On November 29, 2016, Mr. Honeycutt joined Mr. Tatum and his colleagues, Chase Moore and Wayne Goodman in the control room at Plant Nacogdoches to instruct them on work tasks.

23.     The tone of the conversation among Messrs. Honeycutt, Tatum and Moore was casual and lighthearted and the atmosphere was relaxed.

24.     Among the topics that Mr. Honeycutt raised on November 29, 2016 was the instruction that all operators should use a grinder with the safety guard and face shield or risk termination.

25.     Mr. Honeycutt did not claim that Mr. Tatum had used a grinder in an improper or unsafe manner.

26.     Mr. Tatum did not say or imply that he had used a grinder in an improper or unsafe manner.

27.     Mr. Tatum did not make an outburst during the conversation.

28.     Mr. Honeycutt did not tell Mr. Tatum to "be quiet" during the conversation.

29.     Mr. Ray prepared a disciplinary report dated December 5, 2016.

30.     On December 16, 2016, Mr. Tatum was called to a meeting with Mr. Ray, team leader Thomas Johnson, and Mr. Tatum's human resources business consultant, Jasmine Woods, to discuss the events on November 29, 2016.

31.     Mr. Ray issued Mr. Tatum a disciplinary report on December 17, 2016 regarding

the events on November 29, 2016. In the disciplinary report, Mr. Tatum's actions were

described by Mr. Honeycutt as "Outburst with an attitude that related was [sic] to safety task"

and regarding how to fill a large empty space on the control room wall, Mr. Tatum was alleged

to have said "I know what you can paint on that wall. A mural of me . . . holding a grinder in the

other hand with no guard on it."

32.    Mr. Tatum did not make the statements alleged.

33.    During the meeting on December 16, 2016, Mr. Tatum requested that Mr. Ray

interview Mr. Moore, who would have witnessed Mr. Honeycutt's description of the events on

November 29, 2016 and Mr. Ray did so.

34.    Mr. Moore told Mr. Tatum that when asked about the events of November 29,

2016, Mr. Moore explained to Mr. Ray that the December 5, 2016 disciplinary report

misrepresented the context and conversation that had taken place and that Mr. Tatum did not

make the statements alleged.

35.    Mr. Ray informed Mr. Tatum on December 17, 2017 that after hearing Mr.

Moore's statement, he would leave the report as it was including the statements that Mr. Tatum

and Mr. Moore disputed as being untruthful.

36.    On December 16, 2016, Mr. Tatum called Ms. Woods to discuss the disciplinary

report. During that conversation, Mr. Tatum told Ms. Woods that he was concerned that the

disciplinary report (1) was written in an untruthful manner, (2) was being used to retaliate

against him because of the safety concern he raised in October 2016, which is the subject of an

ongoing OSHA investigation and (3) were done to "set him up" for future disciplinary actions,

which he felt management would use to justify his termination.

37.    Upon information and belief, no actions were taken by Ms. Woods to address Mr.

Tatum's concerns.

38.     Southern Power has a safety "clearance procedure" for de-energizing equipment before commencing work on that equipment and for re-energizing equipment when the work on that equipment was complete. The "clearance procedure" involves (1) making a note in a clearance book and (2) placing a red "do not operate" clearance tag on the equipment indicating that the employee had de-energized the equipment and that it was safe for that employee to commence work on that equipment. When the work on the equipment was completed, (1) the tag would be removed and (2) the clearance book would be updated to indicate that the equipment was cleared to be re-energized.

39.     Mr. Goodman is a certified clearance trainer and is a point-person for electrical issues.

40.     On or about December 18, 2016, Mr. Tatum and his colleague Mack Finn observed that Mr. Goodman had not used a red "do not operate" clearance tag on equipment that he had worked on, indicating that he may not have followed the "clearance procedure."

41.     At the time that Mr. Tatum and Mr. Finn observed what might have been a safety violation, the work had already been completed and the equipment was safe to use.

42.     Mr. Tatum took a picture showing what he and Mr. Finn observed.

43.     Mr. Tatum and Mr. Finn simply suspected that a safety violation had taken place. They did not directly observed the work while in progress and could not have prevented the safety risk.

44.     On December 20, 2016, during Mr. Tatum's regularly scheduled "well visit" appointment, his blood pressure was 162 over 109 (stage two hypertension). He was counseled to check his blood pressure levels twice per day for two weeks and record the results in a diary

and to call or return to the clinic if his blood pressure is greater than 140 over ninety for further evaluation. Mr. Tatum followed his healthcare provider's instructions.

45.     In mid-January 2017, Mr. Tatum was following the "clearance procedure" by making a note in the clearance book.  While he had the clearance book, he checked the date that he and Mr. Finn observed what they suspected to be Mr. Goodman's safety violation and confirmed his and Mr. Finn's suspicions: that Mr. Goodman, had not followed the proper clearance procedure and created a safety risk.

46.     On January 19, 2017, Mr. Tatum followed his healthcare provider's instructions (to check blood pressure levels twice per day for two weeks, record the results in a diary, and return for further evaluation if blood pressure levels are greater than 140 over 90) Mr. Tatum noted that his blood pressure was at a dangerously high level—171 over 110— and promptly scheduled an appointment with his healthcare provider for the next day.

47.     On January 20, 2017, Mr. Tatum noticed a Hex nut on the floor at Plant Nacogdoches's New Compressed Air Building, which indicated that the system's pipe flanges, which should have been tightly bolted by Hex nuts, were loose. After checking more pipe flanges, Mr. Tatum discovered that the problem existed throughout the entire piping of the New Compressed Air Building's system. Mr. Tatum and Mr. Finn then checked and tightened every bolted flange connection to ensure each was torqued correctly and alleviate the safety risk.

48.     Loose pipe flanges pose a major safety concern.

49.     On the morning of January 20, 2017, Mr. Ray and Mr. Tatum had a meeting where they discussed this safety issue, a radio transmission involving Mr. Tatum and Scott Dial.

50.     During the meeting, Mr. Tatum again expressed his continued concern regarding the craftsmanship of the welds that he originally raised in October 2016, which is the subject of

an ongoing OSHA investigation and Mr. Ray asked Mr. Tatum "why can't you just let it go." Mr. Tatum responded that he knew the safety issue was a real hazard that put his and his co-worker's lives at risk.

51.     During the meeting, Mr. Tatum felt tightness in his chest and was allowed to leave work early before his medical appointment.

52.     On the afternoon of January 20, 2017 during a follow-up appointment scheduled to discuss Mr. Tatum's blood pressure, his healthcare provider informed Mr. Tatum that his blood pressure (158 over 106), was at a dangerously high level.  Mr. Tatum's healthcare provider prescribed Mr. Tatum with medication to control his hypertension, instructed him to cease work until his blood pressure levels reached a normal range, and issued him a doctor's release from work.

53.     Mr. Tatum's diagnosis of hypertension means that he suffered from a serious health condition that put him at risk for organ damage, heart failure, stroke, heart attack, and even death if not properly managed.

54.     Hypertension is a condition that involves continuing medical treatment.

55.     Mr. Tatum was given a course of prescriptive medication to alleviate his hypertension.

56.     Mr. Tatum's healthcare provider noted a high correlation between Mr. Tatum's work-induced stress and his blood pressure results.

57.     Because of Mr. Tatum's hypertension, his healthcare provider instructed him to cease work immediately until his blood pressure levels reached a normal range, and issued him a doctor's release from work that made him was unable to perform the functions his position.

58.     Mr. Tatum's need for FMLA leave was unanticipated prior to January 20, 2017.

59.     Before returning to work after receiving his healthcare provider's instructions, Mr. Tatum called his Team Leader, Nicole Jackson, and reported his healthcare provider's findings to her.

60.     Ms. Jackson asked that Mr. Tatum send her a picture of his doctor's release from work by text message and let him know that she would direct a fellow employee, Juan Tovar, to deliver an FMLA packet of paperwork to Mr. Tatum's residence

61.     Mr. Tatum and went home with Ms. Jackson's permission.

62.     Mr. Tatum began his FMLA-protected leave on January 20, 2017.

63.     Mr. Tovar hand delivered a stapled packet of FMLA paperwork to Mr. Tatum's residence on the evening of January 20, 2017, which Mr. Tatum accepted.

64.     On January 21, 2017, Mr. Tatum completed his portion of the FMLA paperwork and hand delivered it to his healthcare provider to complete the doctor's certification.

65.     Mr. Tatum provided sufficient certification of his serious health condition so that Southern Power could independently determine that it was a condition covered by the FMLA.

66.     Days after confirming that Mr. Goodman had not followed safety protocol, on the evening of January 20, 2017, Mr. Tatum reported the safety violation that he and Mr. Finn observed to Ms. Jackson by text message.

67.     On January 26, 2017, Mr. Tatum heard that his healthcare provider had faxed the FMLA packet to Southern Power.

68.     On January 26, 2017, Mr. Tatum sent a text message to Ms. Jackson to follow-up on his FMLA paperwork and doctor's certification.

69.     Ms. Jackson did not reply to Mr. Tatum's text message.

70.     Upon information and belief, Southern Power has not confirmed Mr. Tatum's

eligibility to take FMLA leave.

71.     Southern Power has not notified Mr. Tatum of its determination that he was eligible to take FMLA leave.

72.     Southern Power has not notified Mr. Tatum of its determination that he was ineligible to take FMLA leave.

73.     On February 1, 2017, while Mr. Tatum was still on FMLA-protected leave, Mr. Ray sent Mr. Tatum a text message asking that he come to Plant Nacogdoches "just to talk" and Mr. Tatum agreed to come in the next day.

74.     Mr. Tatum was not aware and had no reason to believe that the meeting Mr. Ray had proposed would be work-related.

75.     On February 2, 2017, Southern Power terminated Mr. Tatum's employment.

76.     On February 2, 2017, Mr. Tatum lost all benefits of his employment with Southern Power.

77.     Southern Power prevented Mr. Tatum from returning to work from FMLA-protected leave.

78.     Southern Power's decision to terminate Mr. Tatum's employment occurred only five days after he followed-up on his FMLA paperwork.

79.     Southern Power's decision to terminate Mr. Tatum's employment occurred only nine business days from his initial notice to Ms. Jackson of his unforeseen need to take FMLA-protected leave.

80.     Upon information and belief, Mr. Tatum's exercise of his FMLA rights was a motivating factor in Southern Power's decision to terminate Mr. Tatum's employment.

81.     Upon information and belief, Mr. Tatum's exercise of his FMLA rights was the

sole motivating factor in Southern Power's decision to terminate Mr. Tatum's employment.

82.     Southern Power's stated reason for terminating Mr. Tatum's employment was that "he failed to timely report what he believed to be an unsafe and highly dangerous work condition [committed by Mr. Goodman]."

83.     Upon information and belief, Mr. Ray did not seek legal counsel regarding Mr. Tatum's FMLA rights.

84.     Upon information and belief, Ms. Jackson did not seek legal counsel regarding Mr. Tatum's FMLA rights.

85.     During their meeting on February 2, 2017, Mr. Tatum asked Mr. Ray how he could they call Mr. Tatum to a formal work-related meeting while he was on FMLA leave and that being at a work-related meeting went against his healthcare provider's orders to avoid the stresses of work.

86.     Mr. Ray then told Mr. Tatum that the company had not processed his FMLA paperwork at the time.

87.     Upon information and belief, Mr. Ray was not aware that the FMLA's protections are triggered when an eligible employee provides their employer with reason to believe that the employee is entitled to FMLA leave.

88.     Upon information and belief, Southern Power had not approved Mr. Tatum's FMLA leave request on the date it terminated his employment.

89.     Upon information and belief, had Southern Power approved Mr. Tatum's FMLA leave, Mr. Ray would have been aware of Mr. Tatum's right to up to twelve weeks of unpaid leave.

90.     Upon information and belief, had Southern Power approved Mr. Tatum's FMLA

12

leave, Mr. Ray would not have felt justified in terminating Mr. Tatum's position immediately.

91.     Upon information and belief, Mr. Finn has not reported the safety incident that he observed alongside Mr. Tatum.

92.     Despite being aware that Mr. Tatum was on FMLA-protected leave, Southern Power terminated Mr. Tatum's employment in violation of his FMLA rights.

93.     Mr. Tatum's reporting of Mr. Goodman's safety violation to Ms. Jackson was done in good faith and in line with Southern Power's value of "Safety First" and Southern Power's Code of Ethics.

94.     Upon information and belief, Southern Power's justification for terminating Mr. Tatum's employment immediately in lieu of following progressive discipline was because it views safety violations as terminable for a first offense notwithstanding the employee's performance record.

95.     At no time during his employment at Southern Power did Mr. Tatum commit a safety violation himself.

96.     Mr. Tatum has an established record of reporting safety violations at Southern Power in a timely manner.

97.     Any delay in Mr. Tatum's reporting of Mr. Goodman's safety violation was unintentional.

98.     Upon information and belief, any delay in Mr. Tatum's reporting of Mr. Goodman's safety violation was immaterial and inconsequential to any resulting safety risks.

99.     Upon information and belief, Southern Power took no disciplinary actions against Mr. Finn for not reporting the safety incident that he observed alongside Mr. Tatum.

100.    Upon information and belief, Southern Power took no disciplinary actions against

Mr. Goodman and only gave him verbal counseling.

101.    Upon information and belief, Southern Power's justification for taking no disciplinary actions against Mr. Goodman was that they determined that he did not engage in "intentional misconduct" to violate procedure.

102.    Upon information and belief, Southern Power had never terminated any similarly situated employee for similar performance.

103.    Upon information and belief, Southern Company retained Mr, Finn, a similarly situated employee as Mr. Tatum who had similar performance Mr. Tatum.

## COUNT ONE:

### INTERFERENCE *IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT*

104.    Mr. Tatum incorporates and realleges paragraphs 1 through 103 of this complaint as if fully set forth here.

105.    Southern Power violated the FMLA's prohibition against interference, 29 U.S.C. § 2615 (a)(1), when it interfered with, restrained, or denied Mr. Tatum's exercise of or the attempt to exercise his FMLA-protected right to receive up to 12 weeks unpaid leave for a serious health condition.

106.    Southern Power violated the FMLA's prohibition against interference, 29 U.S.C. §2615(a)(1), when it interfered with, restrained, or denied Mr. Tatum's exercise of or the attempt to exercise his FMLA-protected right to reinstatement following FMLA-protected leave.

107.    Southern Power failed to notify Mr. Tatum at any time that he was eligible to take FMLA leave, which it was required to do within five business days of when they acquired knowledge that Mr. Tatum's leave may be for an FMLA-qualifying reason, 29 CFR § 825.300(b)(1).

108.     Southern Power's failure to follow 29 CFR § 825.300(b)(1)'s notice requirements constitute interference with the exercise of Mr. Tatum's FMLA rights. *Id.* at § 825.300(e).

109.     Southern Power's violations of the FMLA's prohibition against interference with Mr. Tatum's FMLA-protected rights was done willfully and with malice or reckless indifference of Mr. Tatum's FMLA rights.

110.     After Mr. Tatum gave proper notice of his need for FMLA leave, Southern Power failed to respond to Mr. Tatum's request for a status update on January 26, 2017 regarding the FMLA paperwork he submitted and his medical certification.

111.     Southern Power was aware that Mr. Tatum was on FMLA-protected leave on February 2, 2017 and terminated Mr. Tatum's employment only nine business days following the commencement of his FMLA-protected leave.

112.     Southern Power was aware that Mr. Tatum was on FMLA-protected leave on February 2, 2017 and terminated Mr. Tatum's employment only five business days following his inquiry as to the status of his FMLA paperwork.

113.     By terminating his employment, Southern Power denied Mr. Tatum the benefits to which he was entitled under the FMLA.

114.     Because of Southern Power's actions, Mr. Tatum was prejudiced by losing the benefits of his employment, and suffered damages within the jurisdictional limits of this Court.

115.     Because Southern Power's acts and omissions complained of herein were committed with malice or reckless indifference to his FMLA-protected rights.  In order to punish Southern Power for engaging in unlawful business practices and to deter such actions and/or omissions in the future, Mr. Tatum also seeks recovery from Southern Power for liquidated damages.

## COUNT TWO:

### RETALIATION *IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT*

116.    Mr. Tatum incorporates and realleges paragraphs 104 through 116 of this complaint as if fully set forth here.

117.    Southern Power violated FMLA's prohibition against retaliation, 29 U.S.C. §2615(a)(2), when it  discharged or in any other manner discriminated against Mr. Tatum because he exercised his right to FMLA-protected leave.

118.    Mr. Tatum exercised his rights under the FMLA by taking FMLA-protected leave.

119.    Southern Power retaliated against Mr. Tatum terminating his employment only five business days following his inquiry as to the status of his FMLA paperwork.

120.    Southern Power retaliated against Mr. Tatum terminating his employment only nine business days following the commencement of his FMLA-protected leave.

121.    Mr. Tatum's termination was not justified by any lawful reason and was in direct retaliation for exercising his FMLA-protected rights.

122.    Mr. Tatum's exercise of his FMLA-protected rights was a motivating factor in Southern Power's decision to terminate his employment.

123.    Southern Power's stated justification for its decision to terminate Mr. Tatum's employment, that "he failed to timely report what he believed to be an unsafe and highly dangerous work condition [committed by Mr. Goodman]" is pretextual.

124.    Because of Southern Power's actions, Mr. Tatum was prejudiced by losing the benefits of his employment, and suffered damages within the jurisdictional limits of this Court.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Mr. Tatum, respectfully prays that judgment be entered for Mr. Tatum against Southern Power as follows:

1. Declare that the acts and practices complained of here are in violation of Mr. Tatum's rights as secured by the FMLA;

2. Require Southern Power to reinstate Mr. Tatum to a position of equal duties and responsibilities with equal pay and benefits as he would have received by for the discriminatory conduct or in the alternative award front pay in an amount the Court deems equitable and just to make Plaintiff whole;

3. Prohibit Southern Power, by injunction, from engaging in unlawful employment practices.

4. Award Mr. Tatum back pay from the date that Mr. Tatum's blood pressure reached a normal range and he was eligible to return to work;

5. Award Mr. Tatum liquidated damages pursuant to 29 U.S. Code § 2617 (a)(1)(A)(iii);

6. Award Mr. Tatum all reasonable and necessary Attorney's fees and reasonable and necessary costs incurred by him or on his behalf in pursuit of this suit, including expert fees as the Court deems appropriate;

7. Award Mr. Tatum pre-judgment and post-judgment interest;

8. Award Mr. Tatum reimbursement of lost retirement, health insurance, and other fringe benefits that he was entitled to through his employment at Southern Power;

9. Award Mr. Tatum such further relief as the Court deems just and proper and to which the he may be entitled at law or in equity.

### JURY TRIAL DEMANDED

Mr. Tatum hereby demands a trial by jury on all issues triable before a jury.

DATED: July 31, 2017

Respectfully submitted,

_____

Katherine Britton
Lead Counsel
Texas Bar No. 24090010*
1800 Main Street
1802
Dallas, TX 75201
(214) 475-2810
kbritton@protonmail.com
*Admitted *pro hac vice*

*Attorney for Plaintiff Brandon L. Tatum*